UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

FELICIA PRINCE,

     Plaintiff,

v.                                                     Case No. 6:16-cv-1103-Orl-37DCI

MELWOOD NURSING CENTER, LLC,

     Defendant.
_____

## <u>ORDER</u>

     This cause is before the Court on consideration of the following: (1) Defendant's Dispositive Motion for Summary Judgment and Supporting Memorandum of Law (Doc. 32); (2) Plaintiff [sic] Motion to Oppose Defendants [sic] Motion for Dispositive Summary Judgment (Doc. 45); and (3) Defendant's Reply to Plaintiff's Response to Defendant's Dispositive Motion for Summary Judgment (Doc. 46).

## I.    BACKGROUND

     In this action under 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e ("**Title VII**") against Defendant Melwood Nursing Center, LLC ("**Melwood**"), *pro se* Plaintiff Felicia Prince ("**Prince**") is an African-American Licensed Practical Nurse ("**LPN**"), who claims that she was subjected to unlawful retaliation and racial discrimination during the year that she was employed at the Life Care Center of

-1-

Melbourne ("**LCCM**").[1] (Doc. 2, ¶¶1, 2, 5, 7, 10.) Specifically, Prince contends that: (1) her direct supervisor, Unit Coordinator Felicia Johnson ("**Johnson**"), subjected her to racially offensive comments ("**Harassment Claim**"); (2) after she informally complained about Johnson to Director of Nursing Maria Zomcheck ("**Zomcheck**") and Executive Director Aaron Preston ("**Preston**"), Melwood rejected Prince's applications and hired less qualified Caucasian nurses for posted day shift positions ("**Day Shift Claims**"); and (3) Melwood subjected Prince to disparate and retaliatory discipline, which included termination of her employment ("**Discipline Claims**"). Prince seeks declaratory relief, compensatory damages, "reinstatement or front pay in lieu thereof [and] her attorneys' fees and litigation expenses." (*See id*. ¶1; *see also* Doc. 33-2, pp. 76–79; Doc. 33-5, pp. 26, 36–37.)

Melwood now moves for summary judgment in its favor on all of Prince's claims ("**Motion**"). (Doc. 32.) According to Melwood: (1) the Harassment Claim fails as a matter of law because the supervisor's comments "were stray remarks that had nothing to do with" any employment decisions; (2) the Day Shift Claim fails because "a shift change is not a promotion as a matter of law," and Prince "does not know the performance history" of the chosen Caucasian nurses; and (3) the Discipline Claim fails because Prince cannot

---

[1] An attorney filed Prince's Complaint; however, he withdrew his representation in November of 2016. (Docs. 22, 23.) Since then, Prince has pursued her claims without the benefit of counsel. Accordingly, the Court has not held Prince "to strict accountability of compliance with the rules of procedure." *See Holifield v. Reno*, 115 F.3d 1555, 1561 (11th Cir. 1997). The Court also has liberally construed Prince's filings. *See Barthelus v. G4S Gov. Sols., Inc.*, 752 F.3d 1309, 1311 n.4 (11th Cir. 2014) (reading briefs "filed by *pro se* litigants liberally").

identify a proper comparator or show that Melwood's non-discriminatory reasons for disciplining and terminating Prince were pretextual. (*Id.*) Finally, Melwood contends that Prince's retaliation claims fail because: (1) Prince did not engage in protected activity; (2) "she cannot prove a causal connection between" any protected activity and the termination of her employment; and (3) again, Prince cannot establish pretext. (*Id.* at 2.) Prince opposed the Motion (Doc. 45), and Melwood replied (Doc. 46). For the following reasons, the Court finds that the Motion is due to be granted in part.

## II.    LEGAL STANDARDS

### A.    Summary Judgment

In accordance with Federal Rule of Civil Procedure 56, a party may request that the court enter summary judgment in its favor on a specified claim or any part thereof. *See* Fed. R. Civ. P. 56(a). The court should not grant such a request unless the movant satisfies its burden to show "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." *Id.*; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In responding to a Rule 56 motion, the burden "shifts to the non-moving party, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact exists." *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006) (citing *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115–17 (11th Cir. 1993)).

Both parties must support their assertions "that a fact cannot be or is genuinely disputed" by: (1) citing to "particular parts of materials in the record" (Rule 56(c)(1)(A)); or (2) "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support

the fact" (Rule 56(c)(1)(B)). *See U.S. v. Four Parcels of Real Prop. in Green & Tuscaloosa Cntys. in Ala.*, 941 F.2d 1428, 1438 (11th Cir. 1991) (explaining that movants may point to an absence of evidence to support an issue on which the non-movant bears the burden of proof at trial). The court may consider an asserted "fact undisputed for purposes of the motion" if such fact is not properly supported or addressed (Rule 56(e)), and it "need consider only the cited materials" (Rule 56(c)(3)).

The Court must view the cited material and all reasonable inferences drawn from such material in the light most favorable to the non-movant. *See Battle v. Bd. of Regents*, 468 F.3d 755, 759 (11th Cir. 2006). So viewed, the court should find that a "factual dispute is genuine" only if the cited evidence would allow "'a reasonable jury [to] return a verdict for the nonmoving party.'" *Four Parcels*, 941 F.2d at 1437 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The "court need not permit a case to go to a jury . . . when the inferences that are drawn from the evidence, and upon which the non-movant relies, are 'implausible.'" *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 743 (11th Cir. 1996).

**B.      Discrimination & Retaliation**

Under § 1981 and Title VII, employers may be sued: (1) for the unlawful employment practice of intentionally discriminating against a person based on her race (*see* 42 U.S.C. §§ 2000e-2(a)(1)[2]); and (2) for subjecting a person to injurious retaliation because she has opposed such an unlawful employment practice (*see id*. § 2000e-3(a)). *See*

---

[2] Specifically, Title VII prohibits certain employers from failing or refusing to hire or discharging any individual, or otherwise discriminating "against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of" such individual's race. 42 U.S.C. § 2000e-2(a)(1).

42 U.S.C. §§ 1981, 2000e-5(f); *see also Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006) (noting that Title VII protects individuals "from retaliation that produces and injury or harm" but "not from all retaliation"). The legal elements of intentional discrimination and retaliation claims are the same under § 1981 and Title VII. *See Rice-Lamar v. City of Ft. Lauderdale, Fla.*, 232 F.3d 836, 843 n.11 (11th Cir. 2000).

The focus of retaliation and most discrimination claims is to determine whether unlawful "animus motivate[d] a challenged employment decision." *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004) (quoting *Damon v. Fleming Supermkts. of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999)). The existence of such animus is an issue of fact that the plaintiff may prove "through direct evidence, circumstantial evidence, or statistical proof." *See Schoenfeld v. Babbitt*, 168 F.3d 1257, 1266 (11th Cir. 1999); *Nix v. WLCY Radio/Rahall Comms.*, 738 F.2d 1181, 1185 (11th Cir. 1984) ("Intentional discrimination is an issue of fact."); *see also Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1274 (11th Cir. 2008) (noting that "illegal disparate treatment" is proved "through either direct evidence or circumstantial evidence").

In the U.S. Court of Appeals for the Eleventh Circuit, evidence that "reflects 'a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of'" is considered "direct evidence." *See Wilson*, 376 F.3d at 1086 (quoting *Burrell v. Bd. of Trs. of Ga. Military Coll.*, 125 F.3d 1390, 1393 (11th Cir. 1997)). When direct evidence is provided, unlawful animus is proved without resort to inferences or presumptions. *See id*. In contrast, circumstantial evidence merely "suggests" an unlawful motive. *See id*.

When a plaintiff relies solely on circumstantial evidence, she may raise a rebuttable presumption that the employer acted illegally by establishing a prima facie case. *See Burke-Fowler v. Orange Cnty., Fla.*, 447 F.3d 1319, 1322–23 (11th Cir. 2006) (discussing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)); *see also Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1264–65, 68 (11th Cir. 2010). The methods of presenting a prima facie case "are flexible and depend to a large degree upon the employment situation." *Wilson*, 376 F.3d at 1086 (citing *Nix*, 738 F.3d at 1185); *see Rice-Lamar*, 232 F.3d at 842–43 (explaining that the prima facie case method is not "rigid, mechanistic, or ritualistic").

If the plaintiff establishes her prima facie case, the employer may rebut the presumption of illegal conduct by clearly setting forth, "through the introduction of admissible evidence," the non-discriminatory reasons for the challenged employment decision. *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255–56 (1981)); *see also Meeks v. Comput. Assocs. Int'l*, 15 F.3d 1013, 1019 (11th Cir. 1994) (noting that the defendant's burden is one of production—not proof). When an employer meets its "burden of production, the presumption of discrimination is eliminated," *Jackson v. Alabama State Tenure Commission*, 405 F.3d 1276, 1289 (11th Cir. 2005), and the employee must "come forward with sufficient evidence to permit a reasonable fact finder to conclude that the legitimate reasons given by the employer were not its true reasons, but were a pretext for discrimination," *Vessels v. Atlanta Independent School System*, 408 F.3d 763, 771 (11th Cir. 2005). *See Alvarez*, 610 F.3d at 1265–66 (noting that the plaintiff must meet the employer's proffered reason "head on and rebut it" to survive summary

judgment). Pretext may be shown "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256.

### III.    PRINCE'S BEST CASE[3]

Prince's career in the health field started in 2002, when she became a certified nurse assistant. (*See* Doc. 33-1, p. 16.) Approximately five years later, Prince became an LPN, and she worked for various employers in South Florida until **2013**. (*See id.* at 17–25.) In **July 2013**, Zomcheck interviewed and hired Prince to work at LCCM on the "**Evening Shift**"—from 3 p.m. to 11 p.m. (*See id.* at 26–27, 46–47, 56–57.) When Prince commenced work at LCCM, she was given three days of orientation with Clinical Educator Pamela Frederick. (*Id.* at 47–49.) Prince also received and reviewed an employment handbook and other employment policy documents. (*See id.* at 46–55.)

After ninety days, Prince received a written Performance Review. (Doc. 33-3.) According to the Performance Review, Prince performed "beyond expectations on occasion" and she needed "little or no supervision" in several categories, including: (1) "Knowledgeably and competently delivers basic nursing care to residents;" (2) "Cares for residents and families with genuine care and concern;" and (3) "Demonstrates sensitivity toward resident needs." (*See id.*) Prince was ranked "Satisfactory" in the

---

[3] The facts recited here are not the actual facts of the case. *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006). Rather, they reflect the "best case" for Prince, which is what the Court must consider at the summary judgment stage. *See Robinson v. Arrugueta*, 415 F.3d 1252, 1257 (11th Cir. 2005); *Evans v. Stephens*, 407 F.3d 1272, 1278 (11th Cir. 2005) (noting that the non-movant's version of the facts must be credited when conflicts arise).

remaining categories. (*See id.*)

During Prince's employment with LCCM, Preston served as LCCM's Executive Director, Zomcheck was Johnson's supervisor, Johnson was Prince's first direct supervisor, and Unit Coordinator Laurie Touhey ("**Touhey**") was Prince's second direct supervisor. (*See id.* at 56–57, 77.) Prince testified that Melwood employed "only four black nurses." (*See id.* at 142; Doc. 33-2, p. 62.)

## A.  Johnson's Comments

When Johnson was Prince's supervisor, she subjected Prince to two racially offensive comments. The first comment occurred while Johnson was admiring Prince's finger nails, and she asked whether Prince "went into the hood" to have them done ("**First Comment**"). (Depo. p. 61.) Johnson made the next comment when Prince asked her for an employment reference for a new residence, and Johnson responded "are you skipping out on your rent? I know how you people are" ("**Second Comment**"). (*Id.* at 85; Doc. 33-2, pp. 196–97.)

Prince complained to Zomcheck about Johnson's comments and advised that she did not want to work with Johnson anymore. Although Zomcheck minimized Prince's concerns, Prince was moved to a different unit as a result of her complaint. Nonetheless, Johnson subjected Prince to a third racially offensive comment while she was under Touhey's supervision. (*See* Doc. 33-1, pp. 93, 133.) Specifically, Johnson commented: "I don't know why they get us confused with one another because you're ghetto, you're from the hood" ("**Hood Comment**"). (*Id.* at 93.) Prince contends that when she complained to Zomcheck and Preston about Johnson, Zomcheck told her "Don't listen to

what other people say," and Preston told her that he did not think that "Johnson had malicious intent." (Doc. 32-9, p. 1.) Ultimately, Johnson was not reprimanded for the comments until May of 2014. (*See id*. at 115–18; *see also* Doc. 32-6.)

## B.    Day Shift Positions

Although Melwood "waited several months to address" Johnson's improper comments, Prince contends that Melwood immediately retaliated against her for reporting the comments. (Doc. 45, pp. 3–4.) In **March 2014**, two "**Day Shift**" positions—working 7 a.m. to 3 p.m.—were posted at LCCM. (Doc. 33-1, pp. 79–83.) Compensation for the Day Shift positions was the same as the Evening Shift, but Prince preferred the day time hours and the increased exposure to physicians and educational opportunities, so she applied for the positions. (*See id*.) Zomcheck told Prince that "no night nurses could come to the day shift" and her application was rejected. (*See id*. at 81.) Instead, Zomcheck gave the Day Shift positions to two Caucasian LPNs ("**Trioia**" and "**Myers**"), who had significantly fewer years of nursing experience and less seniority ("**Day Shift Decisions**"). (*See id*. at 79–80, 83; *see also* Doc. 33-4, pp. 35–37; Doc. 45-1.)

## C.    Corrective Actions & the Hotline Call

According to Preston, Prince received multiple "Corrective Action Forms for medication administration errors and other serious errors and performance problems." (Doc. 32-4, ¶4.) Zomcheck issued the first Corrective Action Form ("**First Action**") to Prince a month before she went on maternity leave from November 25, 2013 until January 6, 2014 ("**Leave**"). (*See* Doc. 33-1, p. 77; Doc. 32-2.) According to the First Action:

On 10/23/13 [Prince] clocked out at 2:23 p.m., advised staff nurse she was going to take a meal break. [Prince] was not seen back on the unit until approximately 3:50 p.m. [Prince] left medication cart keys in a drawer at the station. [Prince] did not count out narcotics prior to leaving the facility.

(Doc. 32-1.) The First Action set forth three "Expectations" that Prince: (1) will "notify unit coordinator when leaving unit;" (2) "will be re-educated on the narcotic/narcotic key policy;" and (3) "will take the appropriate time for meal breaks (30 min)."[4] (*See id.*) Prince "refused to sign" the First Action. (*See id.*)

On **May 16, 2014**, Prince phoned Melwood's Ethics Point hotline ("**Hotline Call**") to complain about Johnson's Hood Comment and Prince's concern that another nurse had forged her initials on medical records. (*See* Doc. 32-9; *see also* Doc. 32-7 (providing a copy of Prince's written "complaint regarding the falsification of signature on medical record").) During the Hotline Call, Prince advised that she had reported the Hood Comment to Zomcheck and Preston, and no corrective action was taken. (*See* Doc. 32-9 (characterizing the matter as concerning "[d]iscrimination, bullying and harassment").) Three days after the Hotline Call, Preston and Division Director of Human Resources Mike Iseman ("**Iseman**") interviewed Prince ("**May Interview**"). (*See* Doc. 32-10; *but see* Doc. 33-1, pp. 120–21.)

As a result of Prince's complaints, in **May 2014**: (1) Melwood provided additional education to its LPNs concerning "Medical Record Documentation & Falsification Prevention" (Doc. 32-8); and (2) Zomcheck provided "Cultural Diversity" training to

---

[4] The 30-minute limitation was set forth in a document that Prince received and signed during her orientation. (*See* Doc. 33-1, pp. 50–51.)

Johnson (*see* Docs. 32-5). Given the "severity of the [Hood C]omment," Iseman also instructed Zomcheck to issue a formal written warning to Johnson. (*See* Doc. 32-10.) As instructed, Zomcheck issued a Corrective Action to Johnson, which included the expectation that Johnson would "refrain from any potential racial remarks or jokes in the workplace." (*See* Doc. 32-6.)

Less than a week after the Hotline Call, Zomcheck issued a new Corrective Action to Prince ("**Second Action**"). (*See* Doc. 32-11.) According to the Second Action, Prince did not sign Medication Administration Records ("**MARs**") "at the time medications were given on 5/19/14. On same day [Prince] failed to document nurses note on a patient that was sent out to the hospital." (*See id.*) The Second Action set forth two expectations: (1) Prince "will attend in-service on Medication administration, MAR and nurse note documentation;" and (2) Prince "will complete a one on one Medication pass training." (*See id.*) Prince refused to sign the Second Action and wrote that the violations are retaliatory even though the "findings" are "true." (*See id.*; *see also* Doc. 33-1, pp. 140–41 (agreeing that she failed to document that her patient went to the hospital).)

On **May 30, 2014**, Zomcheck issued a "Suspension Pending Investigation Form" ("**First Suspension**") to Prince concerning the following incident: "Facility audit revealed [Prince] removing narcotics from medcart [sic] but failed to sign that meds were administered to her patients. This occurred for several patients on 5/22, 5/23, 5/24, and 5/26" ("**Audit Incident**"). (*See* Doc. 32-12.) On **June 3, 2014**, Zomcheck issued a Corrective Action to Prince concerning the Audit Incident ("**Third Action**"). (Doc. 32-13.) The Third Action included the following warning: "Job in Jeopardy—Any further

concerns or violations will result in termination." (*See id.*) Prince refused to sign the First Suspension and wrote that it "is retaliation for reporting issues that have not yet been addressed." (*See* Doc. 32-12; *see also* Doc. 31-1, pp. 148–51.) Prince did sign the Third Action and wrote that she agreed to "teaching and intervention" (*see* Doc. 32-13). (*See* Doc. 33-1, pp. 167–68 (testifying that she just wanted to "get over this whole situation"); *see also id.* at 144–46 (providing testimony about her additional training in June 2014).)

## D.    Employment Termination

On **July 8, 2014**, Zomcheck issued a second "Suspension Pending Investigation Form" ("**Second Suspension**") to Prince concerning the following incident: "Patient DH stated that [Prince] medicated her with a Flexeril tablet for her muscle spasms on 7/7/14. Patient DH has no order for that medication, nor was physician notified that patient required a prescription for the Flexeril" ("**Flexeril Incident**"). (Doc. 32-14.) Prince denied that she gave Patient DH a Flexeril.[5] (*See* Doc. 33-1, pp. 176–77.) Nonetheless, during its investigation, Melwood documented that: (1) Patient DH and her husband both stated that Prince had given Patient DH an orange or red pill that they believed was Flexeril (Docs. 32-17, 32-19); (2) after being advised that Patient DH asked for a Flexeril, Prince told another employee that Patient DH was "scheduled" for one (Doc. 32-18); and (3) Patient DH's physician denied that he authorized such medication (Doc. 32-16). Ultimately, Prince "was terminated from employment" at LCCM due to the Flexeril

---

[5] Although Prince denied that she gave Patient DH a Flexeril, she conceded that administering a Flexeril to a patient without doctor authorization would justify employment termination. (Doc. 33-1, pp. 176–77, 179, 186–87.)

Incident. (*See* Doc. 32-4, ¶5; *see also* Doc. 32-15; Doc. 33-2, p. 5.)

**E.     EEOC Complaint**

On **October 22, 2014**, Plaintiff submitted a charge of discrimination to the Equal

Employment Opportunity Commission ("**EEOC**"), which included the following claims:

> THE PARTICULARS ARE (*if additional paper is needed, attached extra sheet(s)*):
> I worked at Life Care Center of Melbourne as a _Licensed Practical Nurse from July 21, 2013 to July 14, 2014. During this time I believe that I was discriminated against based on my race (African American) and because I complained of such.
>
> On or about February 8, 2014, I requested an employment reference from my unit manager, Felicia Johnson. She stated to me, "Why, are you moving? You're not running out on your rent? I know how you people are." I was offended by this comment because Ms. Johnson is white. I requested to move from her unit because that comment made me uncomfortable. Even though I was granted a move, Ms. Johnson was at my new unit the following week and she said to me, "I don't know why they get us confused because you're hood. You're ghetto." There were several other employees who witnessed this statement. I then reported this racial harassment to the Director of Nursing. Nothing was done. Next, I reported it to the Executive Director and nothing was done.
>
> On or about March 2014, I applied for the position of Day Shift Nurse, for which I was duly qualified. The other two applicants were white, less tenured and less qualified and did not meet the posted criteria for the position. I complained about not receiving the position and was told that no night nurse can work on the day shift. I believe that I was not chosen for this position because (1) I am African American; and (2) I complained about illegal race discrimination.
>
> On or about May, 2014, I reported that my initials were falsified on a medical record. I identified the nurse who I believed forged my initials, who is white. I was told by Aron Preston, Executive Director to falsify the record, by signing the initials as my error, which I refused to do. I was suspended, then reinstated, due to the Director of Nursing violation of policy and finally terminated via phone conversation with Aron Preston, ED July 2014 for this false accusation. Nothing was done to the white nurse who forged my initials. I feel it was retaliatory due to the fact that I reported both Department Head and manager to the ethics department.
>
> I believe that my termination was based on my race and the fact that I complained about racial discrimination.

(Doc. 32-20.) On **February 29, 2016**, the EEOC issued Prince a notice of right to sue, and

Plaintiff then initiated this action. (Doc. 2, ¶¶8, 9; Doc. 45-1.)

## IV.     DISCUSSION

**A.     Discipline Claims[6]**

An employee who is "fired for misconduct makes out a prima facie case" of

unlawful discrimination by showing that she is a qualified member of a protected class

who was discharged for conduct that was "nearly identical to that engaged in by [an

employee outside the protected class] whom [the employer] retained." *Rice-Lamar*,

---

[6] Although Prince's Termination was the final event of her employment, the Court addresses the Discipline Claims first because they are the low-hanging fruit.

232 F.3d at 842–43 (quoting *Davin v. Delta Air Lines, Inc.*, 678 F.2d 567, 570 (5th Cir. 1982)). Prince cannot make out a prima facie case because she has not identified any other employee who Melwood retained after a credible accusation was made that the employee dispensed Flexeril—or any other medication—to a patient without authorization. (*See* Doc. 33-2, pp. 63–64, 70.) Thus, Prince has not established a prima facie case of discriminatory termination.

Even if Prince Could establish a prima facie case of discrimination or retaliation, her Discipline Claims would fail because: (1) the Flexeril Incident was a legitimate, nondiscriminatory reason for Melwood's termination of Prince's employment; and (2) Prince has not identified probative evidence showing that Melwood did not believe that the Flexeril Incident actually happened. *See Vessels*, 408 F.3d at 771; *see also Alvarez*, 610 F.3d at 1266 (explaining that the pretext inquiry "centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head").

To the extent Prince bases her Discrimination Claims on the Suspensions and Corrective Actions that preceded her termination, such claims also fail because Prince has not shown that Melwood's legitimate non-discriminatory reasons for these employment actions are unworthy of credence. (*See* Doc. 33-1, pp. 140–41 (agreeing that she failed to document that her patient went to the hospital); *id*. at 156–58, 174–75 (agreeing that she failed to sign for hydrocodone).) Accordingly, the Motion is due to be granted with respect to Prince's Discipline Claims.

**B.     Harassment Claim**[7]

Employees may not be subjected to a workplace "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). To establish her Harassment Claim, Prince must demonstrate that she was subjected to such an abusive working environment, and Melwood "knew, or reasonably should have known, of the harassment and failed to take prompt remedial actions." *See Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646–47 (11th Cir. 1997) (citing *Faragher v. City of Boca Raton*, 111 F.3d 1530, 1535, 1538 (11th Cir. 1997) (en banc)). "The Supreme Court has provided a non-exclusive set of factors to consider in determining whether an environment is hostile," including: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *See id*. (quoting *Harris*, 510 U.S. at 23.)

Johnson's comments were indisputably offensive, but they lack the frequency and severity necessary to establish an abusive working environment. *See Jones v. UPS Ground Freight*, 683 F.3d 1283, 1299–1304 (11th Cir. 2012). Notably, Prince testified that Johnson did not make any adverse decisions about her employment. (*See* Doc. 33-2, p. 48.) Further, Prince did not indicate that she felt threatened by Johnson or anyone else, and there is no evidence that Johnson's comments interfered with Prince's work performance. To the

---

[7] Over Melwood's objection (*see* Doc. 46, p. 3), the Court addresses Prince's Harassment Claim based on a liberal reading of her *pro se* filings (*see supra* n.1).

contrary, after complaining about the first two comments, Prince was assigned to a different Unit Coordinator and she received a partial apology from Johnson. Although Melwood's discipline of Johnson was delayed, there is no indication that such delay rendered Prince's work environment unlawfully hostile. Accordingly, the Motion also is due to be granted with respect to Prince's Harassment Claims.

## C.    Day Shift Claims

Although Johnson's comments did not actually create an unlawfully abusive working environment, Prince's complaints about such comments were statutorily protected activities,[8] which is one of the three elements of a prima facie retaliation case. *See Alvarez*, 610 F.3d at 1268; *see also Furcron v. Mail Centers Plus, LLC*, 843 F.3d 1295, 1311 (11th Cir. 2016) (noting that retaliation protections "extend to those who voice informal" and "implicit" complaints of unlawful employment discrimination). The remaining two elements are that: (1) Prince "suffered an adverse employment action;" and (2) "there is

---

[8] "To recover for retaliation, the plaintiff 'need not prove the underlying claim of discrimination which led to her protest,' so long as she has a good faith belief that the discrimination existed.'" *Meeks*, 15 F.3d at 1021 (*quoting Tipton v. Canadian Imperial Bank of Commerce*, 872 F.2d 1491, 1494 (11th Cir. 1989)). Given Johnson's seniority over Prince, the nature of the comments, and the fact that they recurred after Prince's initial complaint and supervisory change, would allow a reasonable jury to conclude that Prince had an objectively reasonable good faith belief that discrimination existed when she complained about the Hood Comment. *See Furcron*, 843 F.3d at 1311 (reversing summary judgment for employer because plaintiff's informal complaints put managers on notice of potential harassment). Further, at the summary judgment stage, the Court must credit Prince's testimony that she reported Johnson's comments to Zomcheck and Preston. (*See supra* n.3.) Thus, the Court rejects Melwood's contention that Prince "did not engage in statutorily protected activity because she did not complain about race discrimination." (Doc. 32, pp. 21–22; *see also* Doc. 46, p. 5 (characterizing Prince's testimony as "very inconsistent").)

'some causal relation' between" the adverse action and Prince's protected activity." *See Alvarez*, 610 F.3d at 1268 (quoting *McCann v. Tillman*, 526 F.3d 1370, 1375 (11th Cir. 2010)).

1.    **Adverse Employment Action Element**

An adverse employment action is one that would dissuade a reasonable employee "from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at 67–68. This standard is intended to "cover a broad range of employer conduct." *See Thompson v. N.A. Stainless, LP*, 562 U.S. 170, 174 (2011). Nonetheless, the U.S. Supreme Court has warned that the harm to the employee must be "significant"—not "trivial." *See Burlington*, 548 U.S. at 68 (explaining that "petty slights, minor annoyances, and simple lack of good manners" are not adverse actions because they would not deter a reasonable employee from complaining about racial discrimination in the workplace). Depending on the circumstances, a "schedule change" may matter enormously to an employee. *See id.* at 69 (observing that a schedule change might be trivial to some employees, but of extreme importance to a young mother).

Prince was a mother of five who was only a few months back from her maternity Leave when she sought the Day Shift positions. (*See* Doc. 33-1, pp. 10–11, 70–72.) Prince testified that a change to the Day Shift was so important to her that she considered it a promotion even though her pay would not have changed. (*See id.* at 79–83.) Based on this record, a jury could reasonably conclude that Melwood's rejection of her applications for the Day Shift positions "would have been materially adverse to a reasonable employee" in Prince's position. *See Burlington*, 548 U.S. at 71.

2.      **Causal Relation Element**

Because a jury could reasonably conclude that the Day Shift Decisions constituted

adverse employment actions, Prince can establish her prima facie case by showing that

such decisions were not "wholly unrelated" Prince's exercise of statutorily protected

conduct. *See Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1336 (1999). One way to meet

this burden is to show a close temporal proximity between Melwood's knowledge of

Prince's exercise of statutorily protected conduct and Day Shift Decisions.[9] *See id.* The

temporal proximity must be "very close" when it is the only evidence of causality.[10] *See*

*Clark Cnty. School Dist. v. Breeden*, 532 U.S. 268, 273 (2001). The Eleventh Circuit has found

a causal connection based on an interval of up to seven weeks. *See Farley v. Nationwide*

*Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999); *e.g.*, *Crawford v. Carroll*, 529 F.3d 961,

970 (11th Cir. 2008) (noting that a three-month interval is "too long"); *Higdon v. Jackson*,

---

[9] Under this standard, Prince's prima facie case plainly fails with respect to the First and Second Comments. There is no dispute that **Prince was on Leave from November 25, 2013 until January 6, 2014, and Prince testified that** Johnson was Prince's supervisor before she went on Leave, and Touhey was her supervisor when she returned from Leave. (*See* Doc. 33-1, p. 77; Doc. 32-2.) Prince further testified that: (1) Johnson made the First Comment within the first 90 days of Prince's employment (*see id.* at 61); (2) Johnson made the Second Comment when she was Prince's supervisor (*see id.* at 85); and (3) Prince believes that she complained about the Second Comment the day after it happened, and that she was pregnant when she "requested to move from [Johnson's] unit" (*see id.* at 77, 86–87). Thus, these events occurred at least four months *before* the Day Shift Decisions incidents and all but one of the Disciplinary Actions. *See Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (noting that a three month disparity is too long).

[10] A reasonable jury might find that Zomcheck and Preston's dismissive responses to Prince's initial complaints about Johnson and their delay in disciplining and counseling Johnson, are relevant to their intent in making the Day Shift Decisions.

393 F.3d 1211, 1220 (11th Cir. 2004) (finding that intervals "as much as one month" are "not too protracted").

Prince contends in her Complaint that Melwood rejected her applications for a Day Shift position "shortly after" her complaints to Zomcheck and Preston about the Hood Comment. (*See* Doc. 2, ¶¶11–15.) Melwood denied these contentions in its Answer (Doc. 7, ¶¶11–15). During discovery, Prince could not provide definitive testimony concerning this dispute. To the contrary, Prince repeatedly testified that she could not "remember chronologically how the events took place and the timeline." (*See* Doc. 33-1, p. 136; *e.g.*, Doc. 33-2, pp. 43–44 ("I can't recall the exact dates").) Nonetheless, Prince provided testimony from which a reasonable jury could find in her favor on the causal relation element.

Prince testified that Johnson made the Hood Comment after she left Johnson's unit. (*See* Doc. 33-1, pp. 136–37.) It was on a Monday after a "Town Hall meeting" during which Johnson had claimed an award that Prince had earned.[11] (*See id.* at 90–93.) Prince was upset and reported the matter to Zomcheck "as soon as I saw her."[12] (*See id.* at 134.)

_____

[11] According to Iseman's documentation of the May Interview, Prince stated that she reported the Hood Comment to Preston after an "all-staff meeting" that addressed harassment and respect in the workplace, and Johnson subsequently "apologized" to Prince. (*See* Doc. 32-10; *see also* Doc. 33-1, p. 135; Doc. 33-2, p. 202.) Prince testified that Johnson only apologized to her for the First Comment, and she did not recall an "all-staff meeting" occurring before the Hood Comment. (*See* Doc. 33-1, pp. 134–35.) Prince also did not recall meeting with Iseman. (*See id.* at 137.)

[12] Prince provided contradictory testimony that: (1) she provided a written complaint to Preston and Zomcheck right after the Hood Comment because removing herself from Johnson's unit "didn't alleviate the problem" (Doc. 33-1, pp. 93–94; Doc. 33-2, pp. 51–52); and (2) her complaints prior to the Hotline Call on May 16 were "verbal" (*see* Doc. 33-1, pp. 105; Doc. 33-2, pp. 49–50.) Although Prince testified that she "might have

Prince wrote in her notes that the Hood Comment was made in March 2014 (*see* Doc. 33-2, pp. 24–25), but Prince also indicated that the Hood Comment occurred: (1) in February 2014 (*see id*. at 43, 51–52); or (2) in the "May 16th timeframe" (*see* Doc. 33-1, p. 134).

Drawing all reasonable inferences in favor of Prince, and viewing the evidence in the light most favorable to her, a jury could conclude that her complaints about the Hood Comment occurred in mid-February or March 2014—which was in close temporal proximity to the time that Prince was rejected for the Day Shift positions in mid-March. (*See* Doc. 33-2, pp. 51–52 (providing testimony that Prince believed she was not chosen for the Day Shifts because she is "African American" and she "complained about illegal race discrimination" in February 2014); Doc. 33-4, pp. 27–29.) **Thus, Prince has satisfied her burden to establish a prima facie case and she is entitled to a presumption that Melwood's rejections of her Day Shift applications were retaliation for her complaints about the Hood Comment.**

To rebut this presumption, Melwood must clearly set forth non-retaliatory reasons for its rejections of Prince's applications. *See Burdine*, 450 U.S. at 255–56; *see also Meeks*, 15 F.3d at 1019. Melwood has not satisfied this burden. In its discussions of the Day Shift Claims, Melwood does not refute Prince's testimony that she was more experienced and had more seniority than the Caucasian employees. (*See* Doc. 32, pp. 6, 20; Doc. 46, pp. 2,

---

a copy" of the Written Complaint, it does not appear in the record. (*See* Doc. 33-1, pp. 93–95.) Preston averred that Prince did not provide a Written Complaint to him or anyone else. (*See* Doc. 32-4, ¶7.)

3.) Instead, Melwood notes only that: (1) Prince admitted that the First Action was in her file; and (2) she "did not know the performance background of the two Caucasian employees and did not know whether they had Corrective Actions in their files." (*See* Doc. 32, pp. 6, 20.) Melwood does not clearly state that: (1) the First Action disqualified Prince for the Day Shift positions; (2) the "performance background" of the two Caucasian employees was superior to Prince's performance background; or (3) the Caucasian employees did not have Corrective Actions in their files. At the summary judgment stage, the Court may not draw such inferences in Melwood's favor. Accordingly, the Motion is due to be denied with respect to the Day Shift Claims.

### V.   CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1.   Defendant's Dispositive Motion for Summary Judgment and Supporting Memorandum of Law (Doc. 32) is **GRANTED IN PART AND DENIED IN PART** as set forth in this Order.

2.   Summary judgment is entered in favor of Defendant Melwood Nursing Center, LLC and against Plaintiff Felicia Prince on Plaintiff's Harassment Claim and her Discipline Claims.

3.   This matter will proceed to a jury trial on Plaintiff Felicia Prince's Day Shift Claims.

4.   The Agreed Motion for Leave of Court to Have Witness Appear at Trial via Teleconference and Supporting Memorandum of Law (Doc. 47) is **DENIED WITHOUT PREJUDICE.**

5.   Defendant Melwood Nursing Center, LLC is directed to effect the deposition of Maria Zomcheck to preserve her testimony for use at trial in accordance with Federal Rule of Civil Procedure 32(a)(4)(B).

**DONE AND ORDERED** in Chambers in Orlando, Florida, on December 15, 2017.



ROY B. DALTON JR.
United States District Judge

Copies to:
Counsel of Record